**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MAURER RIDES USA, INC.; MAURER
SOHNE, GMBH & CO. KG; MAURER
RIDES, GMBH; ZAMPERLA, INC.; and
ZAMPERLA, SPA,

            Plaintiffs,

v.                                                                Case No. 6:10-cv-1718-Orl-37KRS

BEIJING SHIBAOLAI AMUSEMENT
EQUIPMENT CO., LTD.; GOLDEN
HORSE AMUSEMENT EQUIPMENT
CO., LTD.; BEIJING TONGJUNWEIDA
PLAY EQUIPMENT CO. LTD.; BEIJING
JIUHUA AMUSEMENT RIDES
MANUFACTURING CO., LTD.; and
BEIJING ZHONGLI WEIYE
AMUSEMENT EQUIPMENT CO., LTD.,

            Defendants.

---

### ORDER

This cause is before the Court on the following:

1.    Defendant Beijing Jiuhua Amusement Rides Manufacturing Co., Ltd.'s
Renewed Motion Pursuant to Court's Order of May 1, 2013 (Dkt. 108) to
Set Aside Default Judgment (Doc. 123), filed October 1, 2013;

2.    Golden Horse's Renewed Motion and Memo to Set Aside Default Judgment
(Doc. 124), filed October 1, 2013;

3.    Zamperla Plaintiffs' Response in Opposition to BJARM's Renewed Motion
and Memo to Set Aside Default Judgment (Doc. 128), filed October 15,
2014; and

4.    Zamperla Plaintiffs' Response in Opposition to Golden Horse's Renewed

Motion and Memo to Set Aside Default Judgment (Doc. 131), filed October 25, 2014.

At the hearing on this matter on July 8, 2014, the Court orally granted Defendants' motions in part and denied them in part, for the reasons discussed below.

## BACKGROUND

This case involves a dispute between foreign amusement park ride manufacturers who attend annual trade shows in Florida to promote their products. Plaintiffs—Zamperla, SpA and Zamperla, Inc. (collectively "Zamperla")—are an Italian amusement park ride manufacturer and its U.S. distributor. (Doc. 20, ¶¶ 3–4.) Defendants—Golden Horse Amusement Ride Equipment Co., Ltd. ("Golden Horse") and Beijing Jiuhua Amusement Rides Manufacturing Co., Ltd. ("BJARM")—are Chinese amusement park ride manufacturers. (*Id.* ¶¶ 7, 11.) All parties are members of the International Association of Amusement Parks and Attractions ("IAAPA"), and since at least 2007, all have regularly attended the annual IAAPA trade show in Orlando, Florida. (*Id.* ¶¶ 15–16.)

The IAAPA trade show attracts international and domestic attendees and "provides an opportunity for the sellers and purchasers of amusement rides and roller coasters to come together to discuss the marketing, sales and purchase of said products." (*Id.* ¶¶ 8, 12, 16.) At the 2011 show, Plaintiffs observed Defendants distributing promotional materials depicting imitation Zamperla rides that Defendants were marketing as their own. (*Id.* ¶¶ 33–41, 44–48.) In response, Plaintiffs filed this Lanham Act unfair competition action and served Defendants while they were at the trade show. (Docs. 20, 26, 27.)

When the trade show concluded, Defendants returned to China with the summons. (Doc. 123-2, pp. 9–10.) There, they reviewed the documents and decided to consult an

American attorney for advice on how to proceed. (Doc. 123-2, p. 15.) In December 2011, David Jia, the President of Golden Horse, contacted a California attorney on behalf of both Defendants. (Doc. 124-1, pp. 40–43; Doc. 124-3, pp. 2–3; Doc. 148-1, pp.15–17.) Mistakenly believing that Defendants had been served in China by facsimile or email, the attorney advised Defendants that service had not been properly effectuated pursuant to the Hague Convention and therefore no response was necessary. (Doc. 124-1, pp. 44–46; Doc. 124-3, pp. 2–11.) Satisfied with this advice, Defendants elected not to answer Plaintiffs' complaint and ceased all efforts to investigate or monitor the case. (*See* Doc. 148-1, p. 19.)

Meanwhile, the case progressed. When Defendants failed to appear, Plaintiffs obtained entries of default and then moved for default judgments. (Docs. 31, 33, 37.) Finding that Plaintiffs had adequately alleged unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Court granted the motions and enjoined Defendants from promoting their imitation rides in Florida. (Docs. 47, 49, 50.) Additionally, after an evidentiary hearing, the Court awarded Plaintiffs damages based on profits that Defendants had made from overseas sales of the infringing products. (Docs. 62, 69, 70.)

In November 2012, Defendants returned to the Orlando IAAPA trade show, where they learned of the default judgments for the first time when U.S. Marshals seized promotional materials from their booths. (*See* Doc. 84.) Defendants then appeared in this case and moved pursuant to Federal Rule of Civil Procedure 60(b) to set aside the default judgments for lack of jurisdiction and excusable neglect. (Docs. 90, 93.) The Court denied those motions without prejudice and granted jurisdictional discovery. (Doc. 108.)

Discovery closed and Defendants renewed their motions. (Docs. 123, 124.)

Plaintiffs opposed. (Docs. 128, 131.) The Court held a hearing on the matter. (Docs. 158, 167.) At the hearing, the Court orally granted Defendants' motions in part and denied them in part, indicating that this written Order would follow. (Doc. 167.)

## STANDARDS

Federal Rule of Civil Procedure 60(b)(4) permits a court to set aside a default judgment on the basis that "the judgment is void." A judgment "entered without personal jurisdiction over a defendant is void as to that defendant," *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 924 (11th Cir. 2007) (citation and internal quotation marks omitted), as is a judgment entered without subject matter jurisdiction, *Burke v. Smith*, 252 F.3d 1260, 1263 (11th Cir. 2001). When a defendant challenges jurisdiction under Rule 60(b)(4), the plaintiff "bears the ultimate burden" of establishing that personal and subject matter jurisdiction exist. *Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009) (discussing personal jurisdiction); *United States v. Gentile*, 322 F. App'x 699, 701 (11th Cir. 2009) (addressing subject matter jurisdiction).

Similarly, under Federal Rule of Civil Procedure 60(b)(1), a court may vacate a default judgment on the basis of "mistake, inadvertence, surprise, or excusable neglect." "[F]or purposes of Rule 60(b), 'excusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 394 (1993). The defaulting party bears the burden of establishing excusable neglect. *Florida Physician's Ins. Co. v. Ehlers*, 8 F.3d 780, 783 (11th Cir. 1993).

**DISCUSSION**

## I.    Personal Jurisdiction

Defendants first move pursuant to Rule 60(b)(4) to set aside the default judgments as void for lack of personal jurisdiction. (Doc. 123, pp. 5–16; Doc. 124, pp. 5–18.) For a district court to have personal jurisdiction over a nonresident defendant: (1) the forum state's long-arm statute must provide a basis for exercising jurisdiction, and (2) exercising that jurisdiction must comport with the Due Process Clause of the Fourteenth Amendment. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013).

Plaintiffs argue that the Court has personal jurisdiction over Defendants under the "tortious conduct" provision of Florida's long-arm statute, which confers specific personal jurisdiction[1] over any nonresident defendant who commits a tortious act within the state. (Doc. 123, pp. 6–10 (citing Fla. Stat. § 48.193(1)(A)(2)).) Defendants counter that: (1) § 48.193(1)(A)(2) does not confer jurisdiction over them because no tortious conduct occurred in this case and, if it had,  it would have occurred outside of the State of Florida; and (2) even if § 48.193(1)(A)(2) confers jurisdiction over Defendants, exercising that jurisdiction would offend due process. (Doc. 123, pp. 5–16; Doc. 124, pp. 5–18.) The Court will address these arguments in turn.

First, this Court previously determined that tortious conduct has occurred in this case (*see* Docs. 47, 49)—namely, unfair competition in violation of Section 43(a) of the

---

[1] "[S]pecific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within [the forum state]," whereas "[g]eneral personal jurisdiction is based on a defendant's substantial activity in [the forum state] without regard to where the cause of action arose." *Louis Vuitton*, 736 F.3d at 1352.

Lanham Act. *See Louis Vuitton*, 736 F.3d at 1353 (holding that a Section 43(a) violation is a "tortious act" for purposes of Florida's long-arm statute). Section 43(a) prohibits introducing "false designation[s] of origin" into commerce, and it specifically forbids the sort of trade dress infringement that Defendants committed by advertising their imitation Zamperla rides at the IAAPA trade show. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1985) (holding that Section 43(a) "creates a federal cause of action for trade dress infringement"). Defendants maintain that the tort of unfair competition requires an actual sale or a bona fide offer to sell an infringing product (Doc. 123, pp. 6–8; Doc. 124, pp. 6–9), but the scope of Section 43(a) is not so narrow. *See Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1356 (11th Cir. 1983) (observing that the Lanham Act's coverage is "not limited to the interstate sale or physical transportation of goods"). Rather, it proscribes any use of a false designation of origin that "affects" interstate commerce, including "[a]dvertising that affects interstate commerce and solicitation of sales across state lines or between citizens of the United States and citizens and subjects of a foreign nation." *Id.* Therefore, whether or not Defendants' infringing advertisements led to sales, they violated the Lanham Act and constituted tortious conduct under Florida's long-arm statute.

Second, Defendants' tortious conduct occurred in Florida because it was likely to cause consumer confusion in Florida. Defendants argue that a tort occurs where it causes injury and, as Plaintiffs are not Florida residents and do not maintain a permanent business presence here, the unfair competition at issue could not have injured Plaintiffs in Florida. (Doc. 123, pp. 9–10; Doc. 124, pp. 9–10.) This argument, however, overlooks the fact that trade dress infringement causes two distinct injuries: injury to the trade dress

holder in the form of commercial or reputational harm, *see Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008), and injury to the consuming public in the form of confusion "as to the manufacturer, attributes, or origin of the product," *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1187 n.6 (11th Cir. 2002). The "central concern" in a trade dress infringement case is injury to the consuming public, *see id.*, and thus for jurisdictional purposes the tort occurs at the point of consumer confusion. *Cf. Licciardello*, 544 F.3d at 1283–84 (holding that the tort of trademark infringement occurred in Florida because the infringing product was accessible in Florida, not because the markholder resided there); *see also Louis Vuitton*, 736 F.3d at 1354 (affirming that trademark infringement occurs at the location of consumer access to infringing goods); *Promex, LLC v. Perez Distrib. Fresno, Inc.*, No. 09-22285-CIV, 2010 WL 3452341, at *5 (S.D. Fla. Sept. 1, 2010) (concluding that "the relevant injury is consumer confusion and deception"). By advertising their infringing products to more than 25,000 attendees at the Orlando IAAPA trade show, Defendants created a likelihood of consumer confusion in Florida and thereby committed tortious conduct within the state.

Accordingly, because Plaintiffs' claims arise out of Defendants' tortious acts in the forum, Florida's long-arm statute confers specific personal jurisdiction over Defendants. *See* Fla. Stat. § 48.193(1)(A)(2). The remaining question is whether exercising that jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *Louis Vuitton*, 736 F.3d at 1355. The Court finds that it does.

To determine whether exercising specific jurisdiction comports with due process, courts employ a three-part test, which examines:

> (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within

the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

*Id.* "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (citation and internal quotation marks omitted).

Regarding the first prong, Plaintiffs' claims relate to Defendants' contacts with the forum. The relatedness inquiry turns on "the direct causal relationship between the defendant, the forum, and the litigation." *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010). Here, all of Defendants' relevant connections with this forum involve the infringing IAAPA promotions, which provided the basis for Plaintiffs' unfair competition claims. (*See* Doc. 20, ¶¶ 8, 12, 15–16, 33–41, 44–48.) A "direct causal relationship" therefore exists between Defendants, Florida, and this litigation, and thus the relatedness inquiry is satisfied. *See Louis Vuitton*, 736 F.3d at 1355.

With respect to the second prong, because this case involves an intentional tort, there are two available tests for determining purposeful availment: the *Calder* "effects test" and the traditional "minimum contacts" test. *See id.* at 1356–58 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). In this case, Defendants' purposeful availment exists under either test.

Under the *Calder* effects test, "a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state." *Id.* at 1356. For tortious conduct to establish purposeful availment, it must be: "(1) intentional; (2) aimed at the forum state; and (3) cause[] harm

that the defendant should have anticipated would be suffered in the forum state." *Licciardello*, 544 F.3d at 1286. Here, unfair competition is an intentional tort, *see id.* at 1287, and by making their trade-dress infringing advertisements available to the IAAPA trade show attendees, Defendants aimed tortious conduct at Florida that they should have anticipated would cause harm to the consuming public in the form of consumer confusion. *See id.* at 1283–84; *Louis Vuitton*, 736 F.3d at 1354; *Hyman*, 304 F.3d at 1187 n.6. Accordingly, Defendants purposefully availed themselves to the benefits of this forum under the *Calder* effects test by way of their tortious conduct.

Alternatively, Defendants purposefully availed themselves of this forum under the traditional "minimum contacts" test, under which a defendant's contacts with the forum establish purposeful availment if they: "(1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357. Here again, Defendants availed themselves of this forum by way of their annual IAAPA promotional trips. Year after year, Defendants attend the Orlando IAAPA trade show to advertise their products. (Doc. 20, ¶¶ 15–16.) As previously addressed, those advertisements are directly related to Plaintiffs' cause of action, and "[i]t is well settled that advertising that is reasonably calculated to reach the forum may constitute purposeful availment of the privileges of doing business in the forum." *SEC v. Carrillo*, 115 F.3d 1540, 1545 (11th Cir. 1997); *see also Louis Vuitton*, 736 F.3d at 1357 (finding purposeful availment from the solicitation of business from Florida residents through a defendant's website); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 631 (11th Cir. 1996) (finding

that a Canadian chair manufacturer purposefully availed itself of the privilege of conducting business in Florida by marketing its products in Florida). "[T]his type of marketing is the kind of activity that would lead a person to reasonably expect the possibility of ensuing litigation in a Florida court should some type of dissatisfaction or complications arise." *Sculptchair*, 94 F.3d at 631; *cf. Carillo*, 115 F.3d at 1546–47 (finding that a defendant "could reasonably have expected to be haled into court in this country because it deliberately set about to sell its unregistered securities to United States residents"). Defendants therefore have also demonstrated purposeful availment under the traditional minimum contacts test.

Finally, the exercise of personal jurisdiction over Defendants comports with "traditional notions of fair play and substantial justice." For this determination, the Court considers: "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Louis Vuitton*, 736 F.3d at 1358 (citation and internal quotation marks omitted). Because "modern methods of transportation and communication" have significantly reduced the burden on foreign nationals who are forced to litigate in the United States, only in "rare cases" do the "minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction." *Carrillo*, 115 F.3d at 1547 (citation and internal quotation marks omitted). This is not one such rare case. Defendants routinely travel internationally to market and sell their products, and they have not presented any evidence suggesting that defending this action in Florida would be any more burdensome than conducting those routine marketing efforts. (*See* Doc. 20, ¶¶ 15–16; Doc. 163-1, pp.5–6, 12–14; Doc. 164-2, p. 5.)

Moreover, to the extent that this litigation is burdensome to Defendants, that burden is outweighed by Plaintiffs' interest in litigating the case in their chosen forum, Florida's interest in adjudicating claims that affect its consumers, and the judiciary's "interest in efficiently resolving the dispute in the forum where an extensive record was established and the case was long pending." *Louis Vuitton*, 736 F.3d at 1358. Accordingly, exercising jurisdiction over defendants in this case does not offend traditional notions of fair play and substantial justice.

In sum, this Court has specific personal jurisdiction over Defendants pursuant to the "tortious conduct" provision of Florida's long-arm statute, Fla. Stat. § 48.193(1)(A)(2), and exercising that jurisdiction is consonant with due process. Defendants' motions to set aside the default judgments for lack of personal jurisdiction were therefore due to be denied.

## II.    Excusable Neglect

Defendants next move pursuant to Federal Rule of Civil Procedure 60(b)(1) to set aside the default judgment on the basis of excusable neglect. (Doc. 123, pp. 20–25; Doc. 124, pp. 21–25.) "The determination of what constitutes excusable neglect is generally an equitable one, taking into account the totality of the circumstances surrounding the party's omission." *Sloss*, 488 F.3d at 934. Relevant considerations include "the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer*, 507 U.S. at 395. "The longer a defendant—even a foreign defendant—delays in responding to a complaint, the more compelling the reason it must provide for its inaction

when it seeks to set aside a default judgment." *Sloss*, 488 F.3d at 935.

Defendants primarily argue that the default judgments should be set aside because they had a "good reason" for failing to respond to Plaintiffs' Complaint: they acted on the advice of an American attorney who—based on a miscommunication with Golden Horse's President—mistakenly counseled them that a response was unnecessary.[2] (Doc. 123, pp. 20–23; Doc. 124, pp. 21–24.) Indeed, under some circumstances the failure to meet a filing deadline because of an attorney's mistake of fact can constitute excusable neglect. *See United States v. Davenport*, 668 F.3d 1316, 1324 (11th Cir. 2012). However, regardless of whether Defendants' default is attributable in part to their attorney's initial mistake of fact, Defendants' demonstrated lack of diligence over the subsequent year renders any neglect in this case inexcusable.

The U.S. Court of Appeals for the Eleventh Circuit has consistently held that, where a defendant knows that a case has been filed against it but fails to act diligently to protect its interests, the "defendant does not have a 'good reason' for failing to respond to a complaint." *Sloss*, 488 F.3d at 935–36. In this case, it is undisputed that Defendants had actual notice of this suit. (*See, e.g.*, Docs. 23–24.) Fully aware that this case had been filed against them, Defendants chose—based on the advice of an attorney whom they never retained and who was not licensed to practice in Florida—not to answer the

---

[2] The parties dispute the circumstances that led to the American attorney advising Defendants that no response was necessary. Defendants aver that Mr. Jia told the attorney that he had received the summons in Florida, but the attorney misunderstood him. (Doc. 124, pp. 21–24.) The American attorney, on the other hand, testified that Mr. Jia told him that Defendants had been served in China—hence the discussion of the Hague Convention procedures. (*See* Doc. 124-3, p. 2.) At the hearing on the present motions, Mr. Jia testified in person as to the exchange. (Doc. 167.) To the extent that it bears on the Court's determinations today, the Court finds that Mr. Jia's testimony regarding his exchange with the American attorney is not credible. (*See id.*)

Complaint and instead to rely on the possibility that service had been improperly effectuated. (*See* Doc. 123-2, p. 15; Doc. 123-4, p. 2; Doc. 123-5, pp. 2–3; Doc. 131-87, p. 1.) Then for nearly a year, Defendants did not monitor the case or retain counsel to do so. (*See* Doc. 164-2, p. 4; Doc. 131-57, p. 20; Doc. 131-86, p. 9.) In other words, they made no efforts to ensure that the case was progressing as the attorney had predicted, nor did they take any other action to make sure that their interests were being protected. A defendant's duty to act diligently includes a duty to monitor the proceedings or to put in place minimal procedural safeguards to ensure that their interests are protected. *See Sloss*, 488 F.3d at 935–36; *Ehlers*, 8 F.3d at 784; *Gibbs v. Air Canada*, 810 F.2d 1529, 1537 (11th Cir. 1987). Defendants' failure to do so in this case is fatal to their Rule 60(b)(1) motion.[3]

### III.   Damages

Finally, Defendants move to set aside the damages awarded in the default judgments for lack of subject matter jurisdiction. (Doc. 123, pp. 16–18; Doc. 124, pp. 18–19.) Following a damages hearing and without the benefit of opposition briefing,

---

[3] The Court adds that, on balance, the other equitable considerations relevant to this case also weigh against granting Rule 60(b)(1) relief. *See Pioneer*, 507 U.S. at 395. Weighing in Defendants' favor, they may have valid defenses to Plaintiffs' contentions that their claimed trade dress is inherently distinctive and primarily nonfunctional. (*See* Doc. 124, pp. 24–25.) However, that consideration is outweighed by the prejudicial effect that vacating the default judgments would have on Plaintiffs' claims and on judicial resources. *See Pioneer*, 507 U.S. at 395. While Defendants were idle, Plaintiffs and the Court were not. In the year that passed between Defendants' service (Docs. 26, 27) and their first action in this case (Doc. 85), Plaintiffs continued to prosecute their claims and the Court devoted substantial resources to their adjudication. (*See* Docs. 45, 62 (recording multiple hearings the Court held to resolve Plaintiffs' substantive motions).) Setting the default judgments aside in their entirety at this juncture would make all of those efforts for naught and would force Plaintiffs to relitigate their case on evidence that is becoming increasingly stale.

the Court previously determined that Plaintiffs were entitled to damages under the Lanham Act based on the profits that Defendants accrued from selling their infringing rides overseas. (Doc. 69, p. 3 (citing 15 U.S.C. § 1117(a)); Doc. 70.) Defendants now argue that the Court lacked jurisdiction under the Lanham Act to award those damages, and the Court agrees.

To determine whether the Lanham Act confers subject matter jurisdiction over extraterritorial disputes involving unfair competition, courts consider whether: (1) the defendants are United States citizens; (2) "the foreign activity had substantial effects in the United States"; and (3) "exercising jurisdiction would not interfere with the sovereignty of another nation." *Int'l Café, S.A.L. v. Hard Rock Café Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) (citing *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 643 (2d Cir. 1956)). The absence of one of the first two factors "might well be determinative," and "the absence of both is certainly fatal." *Vanity Fair*, 234 F.2d at 643.

The first two of the above factors are absent in this case. First, neither Defendant is a U.S. citizen. (*See, e.g.*, Doc. 20, ¶¶ 7, 11.) Second, Plaintiffs have not provided any evidence that the overseas sales had a substantial effect on U.S. commerce. Relying on the self-serving affidavit of their President, Plaintiffs argue that "the sale of defective or unsafe products overseas *could* impact Zamperla's trade reputation in the United States" (Doc. 128, pp. 12–13 (emphasis added)). However, this hypothetical injury to Plaintiffs' reputation is too attenuated to constitute a substantial commercial effect. *See McBee v. Delica Co.*, 417 F.3d 107, 126 (1st Cir. 2005) (rejecting the same argument for lack of evidence that any U.S. consumers had been exposed to infringing products or that the plaintiff's U.S. interests had been harmed). Accordingly, because both of the first two

factors are absent in this case, the Court lacked subject matter jurisdiction to consider Defendants' extraterritorial sales. *See Int'l Café*, 252 F.3d at 1278; *Vanity Fair*, 234 F.2d at 643. The default judgments are therefore due to be vacated to the extent that they award damages based on those sales.

Because there were Lanham Act violations in this case, it remains incumbent upon the Court to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). In fashioning an appropriate remedy, "it is the character of the conduct surrounding the infringement that is relevant." *Burger King Corp. v. Mason*, 855 F.2d 779, 782 (11th Cir. 1988). Here, the relevant conduct is Defendants' promotion of its trade-dress infringing products at the IAAPA conference. On the present record, the Court finds that an award of monetary relief based on that conduct would be inappropriate. "[A]ll monetary awards under Section 1117 are 'subject to the principles of equity,'" and the injunctive relief already granted (*see* Doc. 50) appears to satisfy the equities of this case. *Burger King*, 855 F.2d at 783.

Nevertheless, the Court will permit Plaintiffs to move for a new damages award. If they choose to do so, their motion should: (1) identify which evidence, if any, is available now that was unavailable to the Court during the first damages hearing (*see* Doc. 62); and (2) address why that evidence justifies issuing monetary relief. If Plaintiffs fail to file a timely and compliant motion, the Court will enter Second Amended Judgments without awarding damages.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.      Defendant Beijing Jiuhua Amusement Rides Manufacturing Co., Ltd.'s

Renewed Motion Pursuant to Court's Order of May 1, 2013 (Dkt. 108) to Set Aside Default Judgment (Doc. 123) and Golden Horse's Renewed Motion and Memo to Set Aside Default Judgment (Doc. 124) are **GRANTED IN PART AND DENIED IN PART**.

    a.    The motions are **GRANTED** to the extent that they seek to set aside the damages awarded in the default judgments entered against Defendants Golden Horse Amusement Ride Equipment Co., Ltd. and Beijing Jiuhua Amusement Rides Manufacturing Co., Ltd. (Docs. 76, 78).

    b.    In all other respects, the motions are **DENIED**.

2.    The Amended Judgments entered against Defendant Golden Horse Amusement Ride Equipment Co., Ltd. (Doc. 76) and Defendant Beijing Jiuhua Amusement Rides Manufacturing Co., Ltd. (Doc. 78) are **VACATED**.

3.    On or before Friday, August 8, 2014, Plaintiffs may file a motion for damages in compliance with this Order. Failure to so move will result in the Court entering judgment in favor of Plaintiffs and against Defendants without awarding monetary relief.

4.    Pursuant to Federal Rule of Civil Procedure 58(a), the Court will enter Second Amended Judgments by separate Order.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on July 23, 2014.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record