# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ZAMPERLA, INC. and ZAMPERLA,
SpA,

                **Plaintiffs,**

v.                                           **Case No:   6:10-cv-1718-Orl-37KRS**

GOLDEN HORSE AMUSEMENT
EQUIPMENT CO., LTD., and
BEIJING JIUHUA AMUSEMENT RIDES
MANUFACTURING CO., LTD.,

                **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **ZAMPERLA PLAINTIFFS' AMENDED MOTION FOR DAMAGES (Doc. No. 194)** |
| **FILED:** | **December 15, 2014** |

## I.    BACKGROUND.

Plaintiffs, Zamperla SpA and Zamperla, Inc. (collectively "Zamperla"), are, respectively, an Italian amusement park ride manufacturer and its U.S. distributor.  Doc. No. 20 ¶¶ 3-4.  The Defendants at issue in the above-referenced motion are Golden Horse Amusement Ride Equipment Co., Ltd. ("Golden Horse") and Beijing Jiuhua Amusement Rides Manufacturing Co., Ltd. ("BJARM").  Golden Horse and BJARM are Chinese amusement park ride manufacturers.  *Id.* ¶¶ 7-8, 11-12.  Each of these parties is a member of the International Association of Amusement Parks

and Attractions ("IAAPA").   Since at least 2007, each of these parties has regularly attended the annual IAAPA trade show, which, except for 2009, has been held in Orlando, Florida.   *Id.* ¶¶ 15-16; Golden Horse Rule 30(b)(6) Dep., Doc. No. 163-1, at 51:12-14.[1]

At the 2011 IAAPA trade show, representatives of Zamperla observed Golden Horse and BJARM distributing promotional materials depicting imitation Zamperla rides that they were marketing as their own (the "Accused Rides").   Doc. No. 20 ¶¶ 33-41, 44-47.   Specifically, representatives of Zamperla identified the following Zamperla rides being renamed and marketed by Golden Horse:

| Zamperla Rides | Golden Horse Rides |
|---|---|
| Disk'O | Disco |
| Moto Coaster | Motor Roller |
| Power Surge | Cyclone |
| Skydrop | Sky Driver |
| Flying Carousel | Super Swing |

*Id.* ¶ 35.   Representatives of Zamperla identified the following Zamperla rides being renamed and marketed by BJARM:

| Zamperla Rides | BJARM Rides |
|---|---|
| Power Surge | Magic Windmill |
| Sky Drop | Sky Drop |
| Disk'O | Whirlwind Cavalier |

---

[1] In this Report and Recommendation, I will refer to the page numbers in the deposition transcripts, rather than the pages numbers assigned when the transcripts were filed in CM/ECF.

*Id.* ¶ 45.

On November 19, 2010, Zamperla initiated this case by filing a complaint in which Zamperla alleged that Golden Horse and BJARM were engaged in unfair competition in violation of the Lanham Act and Florida law.   Doc. No. 1.   Zamperla caused representatives of Golden Horse and BJARM to be served with process while they were at the 2011 IAAPA trade show.   Doc. Nos. 20, 26, 27.   Zamperla filed an amended complaint on November 17, 2011, in which it added Golden Horse and BJARM's promotion of Accused Rides during the 2011 IAAPA trade show.   Doc. No. 20.   Golden Horse and BJARM did not appear or respond to the complaint.   Accordingly, upon motion by Zamperla, the Court entered defaults against Golden Horse and BJARM.   Doc. Nos. 28, 30, 31, 33.   Zamperla filed a motion for a default judgment, pursuant to which the Court found that Golden Horse and BJARM were liable for violation of the Lanham Act and entered a permanent injunction.   Doc. Nos. 49, 50.   After an evidentiary hearing on damages held August 28, 2012, the Court entered default judgments against Golden Horse and BJARM.   Doc. Nos. 67, 70, 76, 78.

In November 2012, representatives of Golden Horse and BJARM returned to the IAAPA trade show in Orlando, where they learned of the default judgments.   Doc. No. 84.   Golden Horse and BJARM thereafter appeared in this case through counsel and filed motions pursuant to Federal Rule of Civil Procedure 60(b) to set aside the default judgments.   Doc. Nos. 90, 93.   After permitting jurisdictional discovery and holding an evidentiary hearing, the Court granted the motions in part, set aside the damages awarded including attorneys' fees and costs, and vacated the judgments previously entered in favor of Zamperla.   The Court denied the motions in all other respects.   Doc. No. 174.   The Court permitted Zamperla to file a renewed motion for damages to

address a legal issue not presented in the motions for default judgment – whether the Court has jurisdiction to award damages for foreign sales of the Accused Rides.   *Id.* at 16.   The Court required that a motion for damages (1) identify which evidence, if any, is available that was unavailable to the Court during the first damages hearing held on August 28, 2012 (Doc. Nos. 62, 67); and (2) address why the evidence justified issuing monetary relief.   Doc. No. 174, at 15.

After Zamperla filed its motion for damages, I denied the motion without prejudice and permitted the parties to engage in discovery regarding damages.   Doc. Nos. 184, 189.   Zamperla timely filed its amended motion for damages, supported by many exhibits.   Doc. Nos. 194 through 194-23.   Golden Horse and BJARM responded to the renewed motion and filed exhibits in support of the response.   Doc. Nos. 195 through 195-3.   None of the parties requested an evidentiary hearing on the amended motion for damages.

The Court referred the amended motion for damages to me for issuance of a Report and Recommendation.

## II.    LEGAL STANDARD.

The Lanham Act "confers broad jurisdictional powers upon the courts of the United States." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283 (1952) ("*Bulova*").   The Act has been read to reach infringing conduct abroad "when necessary to prevent harm to commerce in the United States." *Atl. Richfield Co. v. Arco Globus Int'l Co.*, 150 F.3d 189, 192 (2d Cir. 1998).

To determine whether the Lanham Act confers subject matter jurisdiction over extraterritorial disputes involving unfair competition, courts consider whether: (1) the defendants are United States citizens; (2) "the foreign activity had substantial effects in the United States"; and (3) "exercising jurisdiction would not interfere with the sovereignty of another nation."   Doc. No. 174, at 14 (quoting *Int'l Café, S.A.L. v. Hard Rock Café Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278

(11th Cir. 2001) (citing *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.3d 1274, 1278 (2d Cir. 1956) ("*Vanity Fair*"))).   The absence of one of the first two factors "might well be determinative," and "the absence of both is certainly fatal." *Id.* (quoting *Vanity Fair*, 234 F.2d at 643) (internal quotation marks omitted).

In *McBee v. Delicia Co.*, 417 F.3d 107, 111 (1st Cir. 2005), the United States Court of Appeals for the First Circuit disaggregated the three *Vanity Fair* factors.   It looked first to whether the defendant was a United States citizen.   It reasoned, albeit in *dicta*, that "the domestic effect of the international activities [of a United States citizen] may be of lesser importance and a lesser showing of domestic effects may be all that is needed." *Id.* at 118; *see also Bulova*, 344 U.S. at 286 ("'Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States.'" (quoting *Branch v. Fed. Trade Comm'n*, 141 F.2d 31, 35 (7th Cir. 1944))).   At least one court in the Eleventh Circuit has followed the *McBee* interpretation of the *Vanity Fair* test.   *RMX Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275, 1290 (N.D. Ga. 2013).

When courts have applied the *Vanity Fair* test to the actions of citizens of other countries, they have "scrutinized with care the nexus between the foreign defendant's activities within the United States and the conduct giving rise to the Lanham Act claims." *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 955 F. Supp. 220, 228-29 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 948 (Fed. Cir. 1998) ("*Aerogroup*").[2]   Courts look to actual effects of the allegedly improper conduct on United States commerce, such as the following: actual confusion by United States citizens; harm to Plaintiff's goodwill in the United States; diversion of sales from a United States company.   *See,*

---

[2] Not all courts apply the *Vanity* Fair test.   The United States Courts of Appeals for the Fourth, Fifth and Ninth Circuits use different factors than those stated in *Vanity Fair*.   *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 29:58 (2015).

*e.g.*, *Totalplan Corp. v. Colborne*, 14 F.3d 827, 830-31 (2d Cir. 1994) (holding that evidence did not establish that foreign sales of the infringing product diverted sales from U.S. plaintiff); *Gucci Am., Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 142 (S.D.N.Y. 2011) ("It is well settled that a showing of consumer confusion or harm to plaintiff's goodwill in the United States is sufficient to demonstrate a 'substantial effect on United States commerce.'").

## III.    STATEMENT OF FACTS.

Representatives of Golden Horse communicated with individuals wishing to purchase Accused Rides during trade shows in the United States.   Golden Horse's Answers to Interrogs., Doc. No. 193, at 10, 15-16 (conversation with Leo Castellon of Honduras); *id.* at 12 (conversation with Macit Etke of Turkey and Misha Alexander of Russia); *id.* at 15 (conversation with a representative of Al-Hokair of Saudi Arabia); Castellon Decl., Doc. No. 180-3 ¶ 4.   Golden Horse averred that it did not provide any price quotes to any customers or potential customers during the IAAPA trade shows in Orlando.   Golden Horse's Answers to Interrogs., Doc. No. 193, at 14. Golden Horse did not sell any amusement rides or components thereof during any of the IAAPA trade shows in the United States.   Golden Horse Rule 30(b)(6) Dep., Doc. No. 163-3, at 228:7-12.

Golden Horse also communicated by email with individuals in the United States who asked for information about Accused Rides.   On May 30, 2006, a potential buyer in Nebraska requested a catalog, technical specifications, and a price list for Golden Horse's rides.   Doc. No. 131-58.   The buyer listed the infringing Super Swing ride as a ride that he was particularly interested in.   *Id.* at 1.   David Jia, Vice President of Golden Horse, responded by forwarding the inquiry to Chuck Bingham, who Mr. Jia identified as Golden Horse's agent in America.   *Id.*; *see also* Golden Horse Rule 30(b)(6) Dep., Doc. No. 163-1, at 6:16-25.   On August 27, 2007, a potential buyer who had

viewed Golden Horse's website[3] inquired about the pricing for four rides, including the Super Swing.   Doc. No. 131-62, at 1.   The buyer indicated that transportation to Puerto Rico would be necessary.   *Id.*   Mr. Jia responded with pricing and installation information.   *Id.* at 2.   There is no evidence that either of these inquiries resulted in a sale.

Golden Horse also marketed some of the Accused Rides at the November 2011 IAAPA trade show in Orlando.   Alberto Zamperla Decl., Doc. No. 176, at 4, 6.   Mr. Jia testified that after learning about the present lawsuit, Golden Horse did not show four of the five Accused Rides in later trade shows and made new catalogs.   Golden Horse continued to promote its Super Swing ride because it was made by many companies.   Jia Test., Doc. No. 166-1, at 26.   However, materials seized from Golden Horse at the beginning of the 2012 IAAPA trade show promoted the Accused Rides.   *Id.* at 33–34.   Golden Horse also advertised the Super Swing and Disco rides in industry publications through October 2012.   Golden Horse's Answers to Interrogs., Doc. No. 193, at 21.

BJARM had brochures at the 2011 IAAPA trade show that contained pictures of its Magic Windmill, Sky Drop, and Whirlwind Cavalier rides.   Doc. No. 160 (Pl.'s Ex. 15).   Materials seized from BJARM at the beginning of the 2012 IAAPA trade show also contained pictures of Accused Rides.   *Id.* (Pl.'s Exs. 17, 18, 19).

Alberto Zamperla, President of Antonio Zamperla, SpA, is aware of numerous instances of mechanical problems and breakdowns in the Disco ride sold by Golden Horse and the Whirlwind Cavalier ride sold by BJARM.   Alberto Zamperla Decl., Doc. No. 176, at 3, 5.   Mr. Zamperla was concerned that the problems with the Accused Rides might cause harm to Zamperla if people

---

[3] Golden Horse maintained an English-language website.   Golden Horse Rule 30(b)(6) Dep., Doc. No. 163-1, at 49:4-6.   Potential customers in the United States could not buy amusement rides from Golden Horse's website.   Jia Test., Doc. No. 166-1, at 23.

thought that the Accused Rides that had problems were Zamperla's rides.   *Id.* at 5.   No evidence

was offered of actual consumer confusion or actual damages to Zamperla's reputation and goodwill.

As for specific sales of Accused Rides, during damages discovery Golden Horse produced

charts showing that it sold seven of the Accused Rides to buyers in Russia, Honduras, Burma, Saudi

Arabia and Turkey from 2008 through 2012.   Doc. No. 194, at 3; Doc. No. 194-1, at 2.   It also

produced a chart showing that it sold a number of the Accused Rides in China from 2007 through

2012.   Doc. No. 194, at 3; Doc. No. 194-2, at 2-3.   More than thirty sales of Accused Rides were

made after Golden Horse was served with process in this case.   Doc. No. 24, at 3 (stating that

service was perfected on Golden Horse on November 16, 2011); Doc. No. 194-1, at 2; Doc. No.

194-2, at 2-3.   No evidence was presented showing that Golden Horse sold any Accused Rides to

a buyer in the United States or installed any Accused Rides in the United States.   *Cf.* Golden

Horse's Answers to Interrogs., Doc. No. 193, at 13.

Zamperla relies specifically on the following evidence of foreign sales of Accused Rides to

establish a substantial effect on United States commerce:

| Date | Buyer | Delivery | Product | Sales Price | Profit[4] |
|---|---|---|---|---|---|
| 12/1/2007 | Abdul Mohsin Al-Hokair Co. for Tourism & Development | Saudi Arabia | Disco | $160,000.00 | $32,660.00 |
| | | | Super Swing | $190,000.00 | $19,040.00 |
| 12/20/11 | Tekno-Set Elec., Ltd. | Aktur Park Antalya, Turkey | Super Swing | $230,000.00[5] | $26,980.00 |
| | | | **Total** | $580,000.00 | $78,680.00 |

The facts developed regarding these sales are as follows.

---

[4]  The parties have stipulated that there is a 14.2% profit margin on Super Swing rides and an 11.9% profit margin on Disco rides.   Doc. No. 194-4.   The profit is calculated by my multiplying the sales price by the applicable profit margin.
[5]  The contract sales price also includes the sale of a Fire Brigade ride.   Doc. No. 194-11.   The contract does not indicate what portion of the price is attributed to the Super Swing ride and what portion is attributed to the Fire Brigade ride.

*Saudi Arabia Sale*.

In 2008, Zamperla sold two of the Accused Rides (Disco and Super Swing) to the Al-Hokair company in Saudi Arabia.   The evidence shows that representatives of Golden Horse and of Al-Hokair attended the same trade show in Dubai in April 2006.   *See* Jia Decl., Doc. No. 180-1 ¶ 12. In July 2007, representatives from Al-Hokair visited Chimelong Park, China and inspected Golden Horse's rides.   *Id.* ¶ 13.   An Al-Hokair representative arranged a second visit to China in October 2007, at which time he indicated that Al-Hokair wished to buy some rides from Golden Horse.   *Id.* ¶ 14.   After the visit, Syed Nazar,[6] the purchasing manager of Al-Hokair, sent emails to Mr. Jia asking for price quotes and inquiring whether Golden Horse would be attending the November 2007 IAAPA trade show in Orlando.   *Id.* ¶ 15; Doc. No. 195-2, at 2-3.[7]   Mr. Jia responded by providing Golden Horse's booth number for the show.    Doc. No. 195-2, at 2.

Golden Horse's sales representatives met with representatives of Al-Hokair at the IAAPA trade show in Orlando in November 2007.   Jia Decl., Doc. No. 180-1 ¶ 15.   After the show, Golden Horse continued contract negotiations with Al-Hokair via email from November 29, 2007, through December 18, 2007.   *Id.* ¶ 16; Doc. No. 195-2, at 5-25.   The subject line of some of these emails reads "Orders at Iaapa Show."   *See* Doc. No. 195-2, at 5-6.   On December 24, 2007, Al-Hokair signed a contract for the purchase of five rides from Golden Horse, including a Super Swing ride and a Disco ride.   Jia Decl., Doc. No. 180-1 ¶ 16; *see also id.* at 10-14.   Golden Horse sold the Disco ride for $160,000.00 and the Super Swing ride for $190,000.00.   *Id.* at 13.   Golden Horse shipped the rides to Saudi Arabia in June 2008.   Golden Horse sent technicians to help install the rides in November 2008.   *Id.* ¶ 17.

---

[6] *See* Doc. No. 194-17, at 2.   Golden Horse's emails, discussed herein, refer to this person as Syed Nather.

[7] Mr. Jia refers to Syed Nazar as Mr. Syed.

Thereafter, Golden Horse continued to conduct business with Al-Hokair.   On October 21, 2012, Mr. Nazar sent an email to Mr. Jia indicating the Al-Hokair was preparing the required list of rides being sought and indicated that they would negotiate during the upcoming IAAPA trade show in Orlando.   Doc. No. 194-17.   Golden Horse did not sell Al-Hokair any additional Accused Rides. Jia Decl., Doc. No. 180-1 ¶¶ 18-22.

*Turkey Sale.*

Tekno-Set is an amusement company based in Ankara, Turkey.   Doc. No. 195-1 ¶ 2.   Ufuk Ercan is the General Manager of Tekno-Set.   *Id.*   Ufuk Ercan first met representatives of Golden Horse in 2005 in Hong Kong, where he expressed an interest in several Golden Horse rides.   *Id.* ¶ 3.   Since that time, Ufuk Ercan has stayed in touch with representatives of Golden Horse, including Leo Jwei Lee, through telephone calls, email and in-person meetings.   *Id.* ¶¶ 4-5, 9; Lee Decl., Doc. No. 180-2 ¶¶ 1, 7-9.[8]   Ufuk Ercan visited the Golden Horse factory in China in 2010.   Doc. No. 195-1 ¶ 6.   He told Mr. Lee that he was planning on buying rides for Turkey in the near future. Lee Decl., Doc. No. 180-2 ¶ 10; Ufuk Ercan Decl., Doc. No. 195-1 ¶ 6.

Golden Horse representatives met Macit Etke, a businessman in Turkey, about the same time they met Ufuk Ercan.   Lee Decl., Doc. No. 180-2 ¶ 21.   Mr. Etke is the owner of Aktur Park, an amusement park in Turkey.   Ufuk Ercan Decl., Doc. No. 195-1 ¶ 8.   Mr. Etke and Ufuk Ercan do business together with the intention of sharing the income generated from the rides.   *Id.* ¶ 8; Lee Decl., Doc. No. 180-2 ¶ 6.

Golden Horse representatives, including Leo Jwei Lee, attended the 2011 IAAPA trade show, which was held from November 15 through November 18, 2011 in Orlando.   Doc. No. 191

---

[8] Mr. Lee refers to Ufuk Ercan as Mr. Ufuk.   Lee Decl., Doc. No. 180-2 ¶ 7.   He refers to another person, who appears to be Ufuk Ercan's brother, as Mr. Ercan.   *Id.* ¶ 6; Ufuk Ercan Decl., Doc. No. 195-1 ¶ 7.   I refer to Ufuk Ercan by his full name to avoid confusion.

¶ 5; Doc. No. 191-2.[9]   Ufuk Ercan did not attend the 2011 IAAPA trade show in Orlando.   Ufuk

Ercan Decl., Doc. No. 195-1 ¶ 10.   Mr. Lee was not scheduled to arrive in Orlando until November

14, 2011.   Doc. No. 191-2.   During the show, Mr. Lee met with Mr. Etke[10] and the two discussed

a number of rides, including the Super Swing ride.   Lee Decl., Doc. No. 180-2 ¶¶ 21-22.[11]   Golden

Horse prepared a Sales Contract dated November 14, 2011, for Al-Hokair representative "Mr.

Majed, CEO" for the sale of a Fire Brigade ride and a Super Swing ride.   Doc. No. 194-16.   Ivonne

Nieves, a paralegal in the law firm of local counsel for Zamperla, attests to a screen shot taken from

a computer seized from Golden Horse in 2012, which, she submits, shows that the Sales Contract

dated November 14, 2011 was modified on November 18, 2011.   Doc. No. 192, at 3; Doc. No. 192-

1.   The Sales Contract dated November 14, 2011, submitted by Zamperla is not signed.   Doc. No.

194-16, at 7.

In December 2011, Ufuk Ercan, accompanied by his brother, visited the Golden Horse

factory for a second time.   Ufuk Ercan Decl., Doc. No. 195-1 ¶ 7; Lee Decl., Doc. No. 180-2 ¶ 11.

During this visit, Tekno-Set purchased a Super Swing ride and Fire Brigade ride for Aktur Park.

Ufuk Ercan Decl., Doc. No. 195-1 ¶¶ 7-8; Lee Decl., Doc. No. 180-2 ¶ 11; *see also* Doc. No. 194-

12 (email in which Ufuk Ercan writes to Mr. Lee that he and his brother are buying the rides to

locate in Mr. Etke's park).   Ufuk Ercan's decision to purchase the rides from Golden Horse was

motivated by his continuous contacts with Golden Horse over the course of six years and was not

---

[9] Zamperla construes the reference in the document to Jianwei Li to refer to Leo Jwei Lee.

[10] Mr. Lee refers to Macit Etke as Mr. Macit.

[11] In his declaration, Mr. Lee stated that the Super Swing ride that was discussed during this conversation was a smaller 30 person ride, which he understood was not an Accused Ride.   Lee Decl., Doc. No. 180-2 ¶ 22.   However, Golden Horse's Answers to Interrogatories indicate that the Super Swing ride discussed at the show was an Accused Ride.   Doc. No. 193, at 12; *see also* Doc. No. 194-10, at 2.

motivated by the meeting between Mr. Etke and Golden Horse at the 2011 IAAPA trade show. Ufuk Ercan Decl., Doc. No. 195-1 ¶¶ 9, 11.

Golden Horse and Tekno-Set, through Ufuk Ercan, signed a purchase contract dated December 20, 2011.   Lee Decl., Doc. No. 180-2 ¶¶ 11-12; Ufuk Ercan Decl., Doc. No. 195-1 ¶ 7. The purchase contract was signed in China.   Lee Decl., Doc. No. 180-2 ¶ 14; Ufuk Ercan Decl., Doc. No. 195-1 ¶ 7.   A page of the contract, dated December 20, 2011, reflects a total purchase price of $233,000.00, which includes a price of $230,000.00 for the rides and $3,000.00 for installation.   Doc. No. 194-11.   The rides were installed in Turkey.   Lee Decl., Doc. No. 180-2 ¶ 23.

The first page of the December 20, 2011 contract (which is all that is in the record) contains the same terms as the November 14, 2011 contract but in a different format.   The representative of Al-Hokair in the November 14, 2011 contract is "Mr. Majed, CEO," while the representative in the December 20, 2011 contract is "Ufuk Ercan, General Manager."   *Compare* Doc. No. 194-16 *with* Doc. No. 194-11.

After this sale, Mr. Lee and other Golden Horse employees drafted a work summary report which emphasized the importance of international trade shows because they provide an opportunity to build a positive reputation in the industry and to meet with international clients for sales in other countries.   Doc. No. 194-5, at 4; *see also* Lee Decl., Doc. No 180-2 ¶¶ 18-19.   The report contains the following passage:

> The features of our products decide it must be a long process of communication and understanding to ink a deal[.]   For example, our division just inked a deal with a Turkey client UFUK about a set of 48-seat Flying Chair[12] and Brave Fire Brigade a few days ago[.]   Actually we met this client in the Asian (Hong Kong) exhibition in 2005, and later he visited Golden Horse several times in years and met all of the sales

---

[12]   During the Golden Horse Rule 30(b)(6) deposition, Mr. Jia, the corporate representative of Golden Horse, testified that the name of the ride should have been translated as Super Swing and not Flying Chair.   Doc. No. 163-1, at 105:1-7.

personnel in our division, also, we met the client in the exhibition in the USA and discussed about some equipment in November, and he was eventually determined to sign the deal until recently[.]   This is not an extreme example, and this is in effect a commonly seen phenomenon in the international business[.]   Imagine if Golden Horse had failed to show in the international exhibitions in a row and failed to build a positive image in the world, there would [not be] any chance for us to compete in the international markets.

Doc. No. 194-5, at 4.[13]

Valerio Ferrari, President and CEO of Zamperla, Inc., testified that he is concerned that because of the disparity in prices that customers will buy imitation rides from Golden Horse rather than the genuine rides from Zamperla.   Ferrari Dep., Doc. No. 163-4, at 124:11-125:8.   Alberto Zamperla attested that Zamperla had a longstanding relationship with the Al Hokair Group in Saudi Arabia and with Aktur Park in Antalya, Turkey, including selling its Disk'O ride to these customers. Zamperla Decl., Doc. No. 176 ¶ 10.   Zamperla did not offer any evidence that that it would have sold one of its rides to either the Al Hokair Group or to Aktur Park if Golden Horse had not offered the Accused Ride to Al Hokair at the contract price.[14]

## IV.   ANALYSIS.

The Court required Zamperla to (1) identify which evidence, if any, is available that was unavailable to the Court during the first damages hearing held on August 28, 2012; and (2) address why the evidence justified issuing monetary relief.   Doc. No. 174, at 15.   I will address these factors first as to BJARM and then as to Golden Horse.

---

[13]   There are only two sales involving Accused Rides to customers in Turkey.   Golden Horse sold a Super Swing ride to Scoskunluna Park in 2010, and a Super Swing ride to Tekno-Set in 2012.   Doc. No. 190-1.   There appears to be no dispute the passage is referring to the Tekno-Set sale.

[14]   Mr. Zamperla averred, "First, I worried and (and have since learned) that worldwide sales were being diverted by [Golden Horse] at these Orlando trade shows by [Golden Horse's] practice of quoting prices to longstanding Zamperla customers for their so called Disco rides and Super Swing rides which were *less than one-half* the typical Zamperla sales price for the genuine Disk'O and Flying Carousel rides." Alberto Zamperla Decl., Doc. No. 176 ¶ 9.   Mr. Zamperla offered no evidence from a purchaser of an Accused Ride to support his belief that the purchaser would have purchased a genuine, more expensive, Zamperla ride if the Golden Horse Accused Ride was not available at a lesser price.

A.      *BJARM.*

In its amended motion for damages, Zamperla did not present any new evidence showing that BJARM's foreign sales of Accused Rides had a substantial effect on United States commerce. It is undisputed that BJARM is a Chinese company. The parties offered no evidence on the third factor of the *Vanity Fair* test. Because the first two factors of the *Vanity Fair* test have not been established as to BJARM, I recommend that the Court find that it does not have subject matter jurisdiction to award monetary damages for BJARM's extraterritorial sales of Accused Rides.

B.      *Golden Horse.*

Zamperla relies on the Saudi Arabia and the Turkey sales of Accused Rides as new evidence that establishes that these sales had a substantial effect on United States commerce.   This is new evidence that was not presented to the Court during the first damages hearing.   The question to be resolved is whether this new evidence is sufficient to show that these foreign sales of Accused Rides had a substantial effect on United States commerce.

Zamperla contends that the evidence is sufficient to show a substantial effect on United States commerce because the evidence shows that representatives of Golden Horse negotiated the sale of Accused Rides with representatives of Al-Hokair and Tekno-Set during IAAPA trade shows in Orlando.   It argues that these negotiations were "essential steps" to the eventual consummation of the sales through contracts entered into in China.   Doc. No. 194, at 4.   Golden Horse responds that these communications in the United States were merely an incidental part of a long series of negotiations that occurred before and after the IAAPA trade shows.   *See, e.g.,* Doc. No. 195, at 11. Therefore, Golden Horse submits that the new evidence is insufficient to show that the sales of Accused Rides to Al-Hokair and Tekno-Set had a substantial effect on United States commerce.

1. <u>The Evidence Does Not Establish That Golden Horse's Foreign Sales of Accused Rides Were Orchestrated From the United States</u>.

Courts have found substantial effects on United States commerce when the foreign infringing activities are orchestrated by conduct in the United States.   In *Levi Strauss & Co. v. Sunrise International Trading Inc.*, 51 F.3d 982 (11th Cir. 1995) ("*Levi Strauss*"), the Eleventh Circuit considered whether a court could exercise jurisdiction over the defendants' manufacturing of counterfeit Levi jeans primarily in China and sale of those products to European buyers.   *Id*. at 984.   The Eleventh Circuit found that the court could exercise extraterritorial jurisdiction because the evidence showed that some or all of the corporate defendants were United States corporations and all of the individual defendants were United States residents.   The alleged transactions involved fraudulent documents stating that the counterfeit jeans were made in the United States.   Many of the alleged illegal activities, including locating and negotiating with prospective buyers and arranging for shipment occurred in the United States.   *Id*. at 985.

In *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171 (3d Cir. 2003) ("*Scanvec*"), the court considered whether the district court erred in exercising extraterritorial jurisdiction under the Lanham Act over the defendants' allegedly infringing sales of photography printing software in China.   The evidence showed that individual defendants Jim and Yuan Chang designed and sold PhotoPRINT software through their company, Amiable Technologies.   Later, Amiable Technologies merged with Scanvec Amiable Ltd. ("Scanvec").   Jim and Yuan Chang became shareholders in and board members of Scanvec, and Jim Chang became President of Scanvec. After Jim Chang was fired as President of Scanvec, the Changs launched a new software company in China called Amica.   Jim Chang's wife, Luciana (who resided in California), brokered an agreement that terminated all of Scanvec's Chinese distributors in favor of an exclusive agreement with SunPack, a company that shared the same office space as Amica.   Thereafter, Jim and Yuan

Chang resigned from Scanvec's board.   Amica hired several of Scanvec's former software engineers and began marketing ColorPRINT, a program like PhotoPRINT.   *Id.* at 173.   Jim Chang also entered into a contract with a company to produce a private-label version of ColorPRINT called SpotColor.   *Id.* at 174.   The Third Circuit found that extraterritorial jurisdiction could be exercised over Amica's allegedly infringing activities in China because Amica orchestrated its actions in China from the United States, using materials and customers developed in the United States to materially further the launch of a confusingly similar product overseas.   "These facts show that Amica's domestic activities formed an essential step in carrying out its foreign conspiracy, resulting in the substantial impairment of Scanvec's business reputation in the United States."   *Id.* at 181.

Zamperla has not presented evidence showing that Golden Horse orchestrated its foreign conduct from the United States in a manner similar to the actions of the defendants in *Levi Strauss* and *Scanvec*.   It is undisputed that Golden Horse does not manufacture the Accused Rides in the United States, and it has not sold the Accused Rides to the United States.   There is no evidence that Golden Horse used the stream of United States commerce to ship any Accused Rides to the foreign purchasers.   There is no evidence that any United States consumer has been confused by the similarity of the Accused Rides to Zamperla rides or that Zamperla's reputation in the United States has been damaged by any of the Accused Rides.

> 2.   The Evidence Does Not Establish that Golden Horse's Conduct at the IAAPA Trade Shows Was an Essential Step in the Foreign Sales of Accused Rides.

It is not clear under the law that conduct in the United States that is "essential" to consummation of a foreign sale of infringing products is sufficient, standing alone, to establish a substantial effect on United States commerce.   Even if it is, the evidence Zamperla has presented

does not establish that Golden Horse's conduct at the IAAPA trade shows in the United States was essential to the sales of Accused Rides to Al-Hokair or Tekno-Set.

In *Atlantic Richfield Co. v. Arco Globus International Co.*, 150 F.3d 189 (2d Cir. 1998) ("*Atlantic Richfield*"), the Second Circuit considered whether it had jurisdiction to award damages for extraterritorial sales of allegedly infringing goods by AGI, a United States corporation.   In that case, Plaintiff Atlantic Richfield Company ("ARCO") alleged that Defendant Arco Globus International Co. ("AGI") engaged in trademark infringement and false designation of origin in violation of the Lanham Act by using the ARCO™ trademark for sales of oil and gas in the former Soviet Union.  *Id.* at 190.   ARCO conceded that AGI's alleged infringing activities all took place in foreign nations.  *Id.* at 192.   Nevertheless, it argued that AGI's activities in the United States were designed to further and support its foreign conduct and, therefore, were essential steps to facilitate its unlawful scheme.  *Id.* at 192-93.   The Second Circuit rejected ARCO's argument.   It found that the Supreme Court's decision in *Bulova* "does not hold that a defendant's domestic activity, even if 'essential' to infringing activity abroad, is alone sufficient to constitute a substantial effect on United States commerce."  *Id.* at 193.   Alternatively, the court found that AGI's domestic activities were not essential to its foreign conduct.  *Id.*   AGI had two employees in the United States, escorted oil-refinery managers on tours of United States refineries, attempted to participate in a Texas-based joint venture and deposited money from foreign sales in a New York bank.  *Id.* at 191, 193.   The court found that these activities did not establish that the foreign sales had a substantial effect on United States commerce because ARCO had "not shown that, without such contact, AGI's foreign activities would be impeded or rendered more costly."  *Id.* at 193.

In *Aerogroup*, the court found that a foreign company's placement of orders for infringing goods through a U.S. company was insufficient to establish a substantial effect on United States

commerce.   955 F. Supp. at 231.   In that case, Aerogroup International, Inc. ("Aerogroup") alleged that Marlboro Footworks Ltd. ("Marlboro"), an American buying agent, and Bata Industries Ltd. ("Bata"), a Canadian company that was a customer of Marlboro, infringed its intellectual property rights in its Aerosoles shoes.   *Id.* at 221.   Bata's contacts with the United States were limited to attending trade shows in the United States and placing its orders for the allegedly infringing shoes through Marlboro, an American company.   *Id.* at 231.   The shoes themselves were manufactured in Taiwan, shipped directly to Canada and sold exclusively in Canada.   *Id.* at 223, 231.   There was no evidence that Bata had taken any steps to solicit business from American consumers.   *Id.* at 231 n.15.   The Court concluded, based on this evidence, that it could exercise extraterritorial jurisdiction over Marlboro's sales to Canada but not over Bata's sales of the infringing shoes in Canada.   *Id.* at 229-31.   As to Bata, it reasoned as follows:

> Placing orders through an American company [Marlboro] for foreign manufactured goods which, for the sake of this analysis, are presumed to compete abroad with the goods of another American company [Aerogroup] does not establish a sufficient nexus to allow this Court to extend the reach of the Lanham Act to the foreign company's foreign sales.

*Id.* at 231.

Applying the rationale of these cases to the facts presented in the present case shows that Zamperla's essential steps argument is insufficient to establish that Golden Horse's conduct in the United States had a substantial effect on United States commerce.   First, merely negotiating with a company in the United States to sell infringing goods that will be manufactured abroad and shipped in foreign commerce is not sufficient, under the *Aerogroup* reasoning, to establish a substantial effect on United States commerce.   Second, conduct in the United States is not "essential" to foreign sales of infringing goods if the evidence shows that the foreign sales would not have been impeded or rendered more costly if the conduct in the United States had not occurred.

As to Al-Hokair, the evidence shows that representatives of Golden Horse and Al-Hokair met at a trade show in Dubai.   Before the 2007 IAAPA trade show in Orlando, representatives of Al-Hokair had already visited Golden Horse's facilities in China and expressed an interest in buying Accused Rides.   While there is evidence that Mr. Nazar negotiated the purchase of Accused Rides with Golden Horse during the trade show, the negotiations continued after the trade show.   The contract to purchase two Accused Rides was not entered into in China until December 2007.   Similar to Bata's transactions in *Aerogroup*, Golden Horse shipped the rides from China to Saudi Arabia where they were installed in November 2008.   Under these circumstances, the ability to meet at the IAAPA trade show was convenient but not essential to the consummation of the foreign sales of Accused Rides to Al-Hokair.   Therefore, I recommend that the Court find that the evidence does not establish that Golden Horse's conduct in the United States was an essential step in the foreign sales of Accused Rides to Al-Hokair and that Zamperla has not established that those sales substantially effected United States commerce.

Similarly, as to Tekno-Set, the evidence shows that representatives of Golden Horse met Ufuk Ercan and Macit Etke in 2005.   Ufuk Ercan and representatives of Golden Horse engaged in communications thereafter.   In 2010, Ufuk Ercan visited the Golden Horse facilities in China and stated that he was planning on buying rides for installation in Turkey.   Thereafter, representatives of Golden Horse met with Mr. Etke in the United States at the 2011 IAAPA trade show where they engaged in negotiations regarding sales of an Accused Ride, among other rides. There is, however, no evidence that Golden Horse and Mr. Etke entered into a contract for the sale of an Accused Ride at the IAAPA trade show.   Rather, after the show concluded, Ufuk Ercan continued the negotiations by traveling to Golden Horse's facilities in China in December 2011, at which time he entered into a contract to purchase an Accused Ride and another ride for installation in Turkey.   Golden Horse

shipped the rides from China to Turkey where they were installed.   Based on this evidence, the meeting between Mr. Etke and representatives of Golden Horse at the IAAPA trade show was not an essential step necessary to facilitate the foreign sale of the Accused Ride that was under negotiation before and after the communications in the United States.   Therefore, I recommend that the Court find that the evidence does not establish that Golden Horse's conduct in the United States was an essential step in the foreign sales of an Accused Ride to Tekno-Set and that Zamperla has not established that those sales substantially effected United States commerce.

3.    <u>Zamperla Has Not Shown Actual Confusion by United States Consumers, Damage to Its Reputation in the United States or Diversion of Sales</u>.

In the Order vacating the default judgments, the Court found that evidence that "'the sale of defective or unsafe products overseas *could* impact Zamperla's trade reputation in the United States'" was too attenuated to constitute a substantial commercial effect.   Doc. No. 174, at 14.   The evidence presented in support of the new motion is similarly speculative.   Therefore, I recommend that the Court find that Mr. Zamperla's concerns about possible confusion by United States consumers that may result in damage to Zamperla's reputation is insufficient to establish a substantial effect on United States commerce.

Similarly, Alberto Zamperla's belief that Zamperla sales of genuine rides have been diverted by Golden Horse offering Accused Rides at a lesser price is not supported by any evidence from a purchaser stating that it would have bought a genuine Zamperla ride, at a greater cost, if an Accused Ride was not available at a less price from Golden Horse. Therefore, this evidence is insufficient to establish that Golden Horse actually diverted sales of Zamperla rides.   Accordingly, I recommend that the Court find that Mr. Zamperla's

belief that Golden Horse was diverting sales from Zamperla is insufficient to establish a substantial effect on United States commerce.

> 4.    Zamperla Has Not Established that this Court May Exercise Extraterritorial Jurisdiction.

Because Golden Horse is a Chinese corporation, Zamperla has not met the first *Vanity Fair* factor.   Because the evidence does not establish that the extraterritorial sales of Accused Rides to Al-Hokair and Tekno-Set had a substantial effect on United States commerce, Zamperla has not met the second *Vanity Fair* factor. As noted above, neither Zamperla nor Golden Horse presented evidence regarding the third *Vanity Fair* factor.   Because the first two factors of the *Vanity Fair* test have not been established as to Golden Horse, I recommend that the Court find that it does not have subject matter jurisdiction to award monetary damages for Golden Horse's extraterritorial sales of Accused Rides.

> C.    *Attorneys' Fees.*

Zamperla again seeks an award of the reasonable attorneys' fees it incurred in this litigation. The Lanham Act, 15 U.S.C. § 1117(a), permits a court to award reasonable attorneys' fees to the prevailing party in exceptional cases.   The Eleventh Circuit has described an exceptional case as "one that can be characterized as 'malicious, fraudulent, deliberate and willful,' or one in which 'evidence of fraud or bad faith' exists."   *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1335 (11th Cir. 2001) (per curiam) (citations omitted) (quoting *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989), and *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1169 (11th Cir. 1982)).   In its response to the amended motion for damages, neither Golden Horse nor BJARM challenged the Court's earlier finding that this is an exceptional case entitling Zamperla to an award of reasonable attorneys' fees (Doc. No. 49, at 2).

In the Order Granting Permanent Injunction, the Court found that the actions of Golden Horse and BJARM were deliberate, willful and intentional.   Doc. No. 50, at 2.   After the entry of that order, the Court further found as to Golden Horse that Mr. Jia, its Vice President, did not present credible testimony at the hearing on the motion to vacate the default judgment.   Doc. No. 174, at 12 n.2.   Zamperla presented evidence that Golden Horse and BJARM brought promotional materials depicting Accused Rides for use at the 2012 IAAPA trade show after they had been served with process in this case.   Accordingly, I recommend that the Court reaffirm its earlier determination that Zamperla is entitled to a reasonable attorneys' fee to the extent it has prevailed in this litigation.

I previously ordered that Zamperla need not produce evidence in support of its renewed request for attorneys' fees unless and until the Court determines that it is entitled to an award of such fees.   Doc. No. 189, at 2.   Accordingly, I further recommend that the Court order counsel for the parties to confer in a good faith effort to resolve the amount of attorneys' fees to be paid.   If they are unable to resolve the issue amicably, I recommend that the Court permit Zamperla to file a motion for assessment of attorneys' fees supported by evidence of the reasonable hourly rate of each professional and time sheets showing the tasks performed and the time expended.   In a renewed motion, Zamperla must exercise billing judgment by seeking fees only for work performed on the successful claims for injunctive relief.   *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983); *see also Norman v. Hous. Auth.*, 836 F.2d 1292, 1302 (11th Cir. 1988) ("If the result was partial or limited success, then the lodestar must be reduced to an amount that is not excessive.").

## V.      RECOMMENDATION.

For the foregoing reasons, I **RESPECTFULLY RECOMMEND** that Zamperla's Amended Renewed Motion for Damages (Doc. No. 194) be **DENIED in part** to the extent it seeks damages for extraterritorial sales of Accused Rides.   I further **RECOMMEND** that the motion be **GRANTED in part** as to the request for an award of attorneys' fees, and that the Court (1) find that Zamperla is entitled to an award of reasonable attorneys' fees, and (2) permit Zamperla to file a motion for assessment of attorneys' fees within a time established by the Court, if necessary, after a good faith effort by counsel for the parties to resolve the issue.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on April 29, 2015.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy